**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

GLEN J. PERRY,                     :   Civil Action No. 06-5386(NLH)
                                   :
                                   :
          Plaintiff,               :
                                   :
     v.                            :   **OPINION**
                                   :
FRANCIS J. HARVEY,                 :
SECRETARY OF THE U.S. ARMY,        :
                                   :
          Defendant.               :
                                   :

**APPEARANCES:**

F. Michael Daily, Jr., Esquire
Sentry Office Plaza
216 Haddon Avenue
Suite 100
Westmont, NJ 08108

     *Attorney for Plaintiff*

Leah A. Bynon, Esquire
Rebecca E. Ausprung, Esquire
Office of the United States Attorney
970 Broad Street, Suite 700
Newark, NJ 07102

     *Attorney for Defendant*

**HILLMAN**, District Judge

     This matter has come before the Court on defendant's motion

for summary judgment on plaintiff's claims for hostile work

environment and retaliation.  For the reasons expressed below,

defendant's motion will be granted.[1]

―――――――――――――――――――

     [1]Two months after filing his opposition to summary judgment,
plaintiff filed an "Ex-Party Motion for Leave to File a
Supplemental Memorandum in Opposition to Summary Judgment."
(Docket No. 20.)  Plaintiff states that he wishes to supplement
his opposition because after the filing of his opposition, "rumor

**BACKGROUND**

Plaintiff, Glen J. Perry, is an African-American male who in the summer of 2000 became a police officer for the Fort Dix Directorate of Public Safety at Fort Dix, New Jersey. Plaintiff was removed from service with an effective date of April 23, 2006. Plaintiff claims that during his employment he was subjected to a hostile work environment because of his race, and retaliation based on his filing of complaints with the Equal Employment Opportunity Commission (EEOC) and other protected activities. Plaintiff also claims that his termination was a result of this discrimination and was unjustified.

Defendant has moved for summary judgment on all of plaintiff's claims. Plaintiff has opposed this motion.

**DISCUSSION**

**A.   Jurisdiction**

This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 2000e-16(c), which provides that any federal government employee, "within 90 days of receipt of notice of final action taken by a department, agency, or unit . . . if aggrieved by the final disposition of his complaint, or by the failure to take final action on his complaint, may file a civil action as

---

reached plaintiff regarding the prior employment status of a witness against plaintiff." (Pl. Mot. at 3.)  As explained below in footnote 14, plaintiff's "new" information does not change the analysis of his claims. Consequently, plaintiff's motion will also be denied.

2

provided in section 2000e-5 of this title, in which civil action the head of the department, agency, or unit, as appropriate, shall be the defendant."

    **B.   Summary Judgment Standard**

    Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56.

    An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."  Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

    Initially, the moving party has the burden of demonstrating

3

the absence of a genuine issue of material fact.  <u>Celotex Corp.</u>
<u>v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once the moving party has
met this burden, the nonmoving party must identify, by affidavits
or otherwise, specific facts showing that there is a genuine
issue for trial.  <u>Id.</u>  Thus, to withstand a properly supported
motion for summary judgment, the nonmoving party must identify
specific facts and affirmative evidence that contradict those
offered by the moving party.  <u>Anderson</u>, 477 U.S. at 256-57.  A
party opposing summary judgment must do more than just rest upon
mere allegations, general denials, or vague statements.  <u>Saldana</u>
<u>v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001).

**C.   Analysis**

   **1.   *Plaintiff's claims***

   In his complaint, plaintiff alleges several incidents that
give rise to his hostile work environment claim.[2]  Plaintiff also
alleges that some of these incidents were acts of retaliation,

_____

   [2]Plaintiff's complaint does not allege a separate count for
hostile work environment, but rather a general claim of
discrimination (Count I).  Because of this, defendant takes the
position that plaintiff has not asserted any hostile environment
claim, and argues that plaintiff's allegations of discrimination
are discrete acts, each warranting dismissal in defendant's
favor.  However, as stated by plaintiff in his opposition to
defendant's motion, his complaint alleges throughout that he was
subject to a "racially hostile environment."  Thus, even though
plaintiff has not alleged a specific count for hostile work
environment, the Court will construe plaintiff's pleading as a
whole and finds that plaintiff has alleged a hostile environment
claim.

which plaintiff argues not only serve as a basis for his retaliation claim, but also serve as a basis for his hostile environment claim. Additionally, plaintiff contends that he engaged in five acts of protected activity that preclude defendant's discriminatory conduct. Plaintiff's allegations are as follows:

1.    Shortly after plaintiff began working at the police desk at the Air Mobility Warfare Center ("Warfare Center") in the summer of 2000, plaintiff claims that he was confronted by the husband of his future second-line supervisor, Lieutenant Bonnie Graham-Morris.[3] Plaintiff claims that Lt. Morris's husband stated, "I understand you're the new house boy cop." (Compl. ¶ 14.)

2.    Sometime in 2000, plaintiff claims that he overheard Lt. Morris stating that "men of color were dumb, stupid and ignorant." (Compl. ¶ 15.)

3.    On March 17, 2003, the vehicle plaintiff was assigned to transport himself from police headquarters to his duty station at the Warfare Center was "suddenly removed from plaintiff and he became the only officer without an assigned vehicle."   (Compl. ¶

_____

[3]Lt. Morris was not plaintiff's supervisor until January 2003.

5

32.)[4]

4.    Sometime in March 2003, plaintiff claims that Lt.
Morris denied plaintiff his request for leave to take his 90 year
old mother to the doctor because of lack of documentation.
(Compl. ¶ 34.)

5.    Also in March 2003, plaintiff completed a work place
satisfaction survey, in which he complained that "mistreatment,
harassment, and inappropriate comments or gestures undermine the
mission, readiness and capability of this dept. and have no place
within this work frame, but yet it goes on everyday with no end
in sight."  He also stated that minorities do not get
preferential treatment or equal treatment.  Plaintiff also
referred to a female supervisor who "holds the rank of
lieutenant" who received preferential treatment, and provided
specifics about that alleged preferential treatment.  (Compl. ¶¶
24-27.)

6.    Plaintiff claims that in June 2003, Lt. Morris did not
allow plaintiff to attend a function for D.A.R.E. officers,
because even though plaintiff had served as a D.A.R.E. officer in

---

[4]Plaintiff later admits, however, that his vehicle was
reassigned to be used for road patrols, and road patrols were not
part of his job duties at the Warfare Center desk.  Plaintiff
also admits that was able to use his D.A.R.E. vehicle to get to
his post, and that this new policy affected all officers who did
not perform road patrols.  (Pl. Response to Def.'s Statement of
Facts ¶ 3.)

the past, he no longer served as a D.A.R.E. officer.  (Compl. ¶ 35.)

7.   On July 2, 2003, plaintiff claims that he was ordered by Lt. Morris to immediately report to a meeting with Stephen Melly, the Director of Public Safety.  When plaintiff arrived at Director Melly's office, Director Melly asked plaintiff why he was there and told him that no meeting had been requested. (Compl. ¶¶ 36-27.)

8.   On August 11, 2003, plaintiff was told that according to Lt. Morris's orders, he had to leave his post at the Warfare Center at the end of his shift rather than be relieved by the next shift.  (Compl. ¶ 39.)

9.   On September 3, 2003, plaintiff filed a complaint with the EEOC, alleging discrimination because of his race and color based on the above allegations.  (Compl. ¶ 45.)  The final resolution of this claim occurred on August 21, 2006, at which time the administrative law judge found that plaintiff had not been subjected to race-based harassment.  (Compl. ¶ 69.) Plaintiff did not appeal that decision, and chose to file this lawsuit instead.

10.   On November 14, 2003, Lt. Morris stopped to question plaintiff about his presence at the entrance of the base in a marked patrol car.  Plaintiff claims that Lt. Morris referred to

him as "boy."   (Compl. ¶ 48.)

11.   On November 29, 2003, Lt. Morris "harassed and
retaliated against the plaintiff by marking him AWOL for a date
that he had requested off and been approved."   (Compl. ¶ 49.)

12.   On January 26, 2004, plaintiff took a random drug test.
Plaintiff claims that Lt. Morris "demanded that the plaintiff
[provide] verification of the test[,] which type of demand was
not part of custom or procedure."   (Compl. ¶ 50.)

13.   On April 13, 2004, plaintiff was removed from his
assignment at the Warfare Center, based on the "pretext" that
there were numerous complaints about him.   (Compl. ¶ 53.)

14.   On September 11, 2005, plaintiff sent an email to
approximately 90 Ft. Dix police officers titled "Injustice at DOD
Police."   The email complained about the temporary promotion of
Lt. Morris, criticized the experience of Director Melly, urged
recipients to "do something about it," and referenced an uprising
known as "Bloody Sunday."

15.   On December 16, 2005, plaintiff was accused of placing
offensive written materials in the mail box of Lieutenant Rick
Sanders.   Plaintiff denies doing so.   (Compl. ¶ 59.)

16.   On January 25, 2006 plaintiff received a notice of
removal from federal service based on the materials placed in Lt.
Sanders' mailbox, the "Injustice at DOD Police" email, and making

a false sworn statement during his EEOC proceedings.  (Compl. ¶¶ 64-67.)

17.  On March 3, 2006, plaintiff filed a second complaint with the EEOC, alleging discrimination based on race and color, retaliation for prior EEOC activity, and for receiving the notice of removal.  (Compl. ¶ 59.)  The EEOC accepted his discrimination and retaliation claims for investigation, but dismissed his claim based on his notice of removal because it was not yet ripe. Plaintiff chose to file this lawsuit instead of pursuing this EEOC claim.  (Compl. ¶ 5.)

18.  On May 9, 2006, plaintiff filed an appeal with the Merit System Protection Board ("MSPB") challenging his removal. The MSPB upheld his removal.  The decision became final on October 11, 2006.  (Compl. ¶ 70.)

### 2. *Whether plaintiff was subjected to a hostile work environment*

Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq., provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

Hostile environment claims are different in kind from claims

for discrete acts of discrimination--their very nature involves repeated conduct.[5]  National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115-116 (2002) (citation omitted) (explaining that the "'unlawful employment practice' occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own").  However, "a mere utterance of an epithet which engenders offensive feelings in an employee" does not sufficiently affect the conditions of employment to implicate Title VII.  Id. (citation omitted).  "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998); see also Caver v. City of Trenton, 420 F.3d 243, 262-63 (3d Cir. 2005) (stating that the "discrimination analysis must concentrate not on individual incidents, but on the overall

---

[5]Because plaintiff did not assert a separate count for hostile work environment, defendant's motion viewed plaintiff's allegations of discrimination as discrete acts.  Based on those discrete acts, defendant argued, inter alia, that plaintiff failed to exhaust his administrative remedies.  The Court will not address defendant's exhaustion argument because plaintiff has clarified that he is contending that defendant's acts of discrimination culminated in a hostile work environment, rather than served as independent discriminatory acts, and because hostile environment claims are not necessarily subject to the exhaustion requirement.  See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002) (stating that a court may look to acts that occurred outside the statutory time period when assessing a hostile work environment claim).

scenario," and that the types of circumstances to consider "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance").

In order to establish a *prima facie* hostile work environment claim under Title VII, a plaintiff must show that: (1) he suffered intentional discrimination because of his race, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person of the same race in that position, and (5) the existence of respondeat superior liability.  Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001); Hamera v. County of Berks, 248 Fed. Appx. 422, 424 n.2 (3d Cir. 2007) (explaining that the Third Circuit has "often stated that discriminatory harassment must be 'pervasive and regular.' But the Supreme Court's standard is 'severe or pervasive.' The difference is meaningful and the Supreme Court's word controls, so we use the severe or pervasive standard").

Here, even taking as true all of plaintiff's allegations, plaintiff has failed to prove his *prima facie* case.  First, with regard to the allegation that Lt. Morris's husband called plaintiff a "house boy cop," Lt. Morris's husband was not employed by defendant, and, therefore, defendant cannot be liable

11

for Lt. Morris's husband's actions.  With regard to plaintiff's
claim that he overheard Lt. Morris state that "men of color were
dumb, stupid and ignorant," plaintiff admits that this comment
was not directed at him.  A comment not directed to plaintiff
cannot serve the basis for his harassment claim.  See Carver v.
City of Trenton, 420 F.3d 243, 262-264 (3d Cir. 2005).
Furthermore, with these events happening three years prior to any
other allegations of harassment, these events cannot be
considered as a part of his hostile environment claim.  Hamera v.
County of Berks, 248 Fed. Appx. 422, 425 (3d Cir. 2007) (holding
that because of a four-year gap between the allegedly
discriminatory comments, the plaintiff failed to pose a genuine
issue of material fact under a continuing violation theory that
the allegedly discriminatory comments that occurred during 2000
or before, and related to plaintiff's religion, were actionable).

     The next allegations of harassment occurred in 2003.
Plaintiff's claims of harassment include: 1) the taking away of
his vehicle; 2) Lt. Morris not allowing him to attend the
D.A.R.E. picnic as a D.A.R.E. officer; 3) Lt. Morris ordering him
to see Chief Melly when Chief Melly did not call for such a
meeting; 4) the requirement that he leave his post at the end of
his shift instead of waiting for his relief to arrive; 5) Lt.
Morris marking plaintiff as AWOL even though his request for time
off had been approved by another supervisor; 6) Lt. Morris asking

plaintiff for verification of his random drug test; and 7) Lt.

Morris calling plaintiff a "boy."[6]  Plaintiff admits that these

alleged actions--except for the "boy" comment--are not "severe"

actions, but he argues that they serve as pervasive evidence of

discrimination.  Plaintiff's argument is unavailing.

These allegations, even if believed as true, do not evidence

that plaintiff was subjected to a hostile environment because of

his race.  Plaintiff does not dispute, or provide evidence to

dispute: 1) he was reassigned to his D.A.R.E. vehicle to get to

his post because his patrol car was needed for field patrols, a

function for which plaintiff did not use his patrol vehicle; 2)

plaintiff was not the D.A.R.E officer at the time of the picnic,

and plaintiff could have attended as a guest but chose not to[7];

3) the "phantom meeting" with Chief Melly was a misunderstanding;

---

[6]In his complaint, plaintiff also alleges that Lt. Morris
denied him leave to take his mother to the doctor.  Plaintiff
claims that Lt. Morris denied his request because of his lack of
documentation, despite the fact that he had never needed
documentation on prior occasions. In his brief, which more
specifically sets forth his hostile environment claim, plaintiff
does not state that this event serves as part of his harassment.
Even if plaintiff claims that this forms the basis of his
harassment claim, it is not actionable because he has not
articulated how this detrimentally affected him or otherwise
affected a condition of his employment.

[7]Plaintiff alleges for the first time in his opposition
brief and supporting affidavit that before the D.A.R.E. picnic,
Lt. Morris's husband made a race-based comment about plaintiff to
another individual.  Again, even if this were true, defendant
cannot be liable for the comments of a person who not his
employee.

4) plaintiff's shift ended at 2:00pm and the requirement for him
to leave at the end of the shift was applied to all officers who
worked at the Warefare Center; and 5) plaintiff was never marked
as AWOL and received full pay for that day.  These incidents do
not show that plaintiff was subjected to pervasive discrimination
because of his race.

The other two acts of harassment also do not support a
hostile environment claim.  The fact that Lt. Morris asked for
verification of plaintiff's drug test, when "all she had to do
was call the testing center and have them confirm that he took
the test" (Pl. Aff. ¶ 8), is insufficient to show a hostile
environment based on race.  A supervisor asking her employee for
verification that the employee took a job-mandated drug test is
not harassment.

Additionally, Lt. Morris calling plaintiff a "boy," even if
taken as true, is not sufficient to maintain a *prima facie* case
of hostile environment.  One isolated comment to plaintiff,
although inappropriate, does not rise to the level of evidence of
continuing harassment.  See Faragher, 524 U.S. at 788 (holding
that "mere offensive utterance" is not actionable); Hamera, 248
Fed. Appx. at 425 (holding that plaintiff's claim "does not
satisfy the second element of 'severe or pervasive' because the
2004 comment regarding the plaintiff--while inappropriate--does
not rise to the requisite level of harassment that a reasonable

14

jury would find actionable").

In sum, considering these allegations as a whole, which is
required when analyzing a hostile environment claim, plaintiff
has failed in his obligation of showing evidence to support that
he suffered intentional, severe or pervasive discrimination
because of his race, and that he was detrimentally affected by
this alleged discrimination.  At most, plaintiff has alleged that
he disagreed with certain job-related decisions made by
management, and that possibly he had a disharmonious relationship
with his immediate supervisor.  Such allegations are insufficient
to make his *prima facie* case.  Consequently, defendant is
entitled to summary judgment on plaintiff's hostile environment
claim.

### 3.   *Whether plaintiff was subjected to retaliation*

Based on the above-outlined allegations, plaintiff also
claims that he was subjected to retaliation because of his
protected activity.  The protected activity that plaintiff
alleges to have engaged in includes the submitting of the
workplace survey, the sending of the "Injustice at DOD Police"
email, the filing of the  affidavit in his EEOC proceeding, and
the filing of his two EEOC complaints.

A claim of retaliation under Title VII uses the burden
shifting framework established in McDonnell Douglas Corp. v.
Green, 411 U.S. 792, 803-05 (1974).  Under that framework, a

plaintiff must first establish a *prima facie* case of discriminatory retaliation under Title VII, which requires a plaintiff to demonstrate that: (1) he engaged in activity protected by Title VII; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. Nelson v. Upsala College, 51 F.3d 383, 386 (3d Cir. 1995). A plaintiff may establish the requisite causal connection by showing a close temporal proximity between the protected activity and the alleged retaliatory conduct, or by submitting "circumstantial evidence . . . that give[s] rise to an inference of causation." Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007).

Should plaintiff establish a *prima facie* case, a presumption of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its actions. "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision. The employer need not prove that the tendered reason actually motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

16

This is a light burden.  Id.

Once the employer answers its relatively light burden by
articulating a legitimate, nondiscriminatory reason for the
unfavorable employment decision, the burden of production
rebounds to the plaintiff, who must now show by a preponderance
of the evidence that the employer's explanation was merely a
pretext for its actions, thus meeting the plaintiff's burden of
persuasion.  Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d
313, 319 (3d Cir. 2000) (citing Reeves v. Sanderson Plumbing
Products Inc., 530 U.S. 2097 (2000)).

There are numerous deficiencies in plaintiff's claims and
proofs regarding his retaliation claim.  With regard to
plaintiff's first protected activity in March 2003--the
completion of a workplace survey in which he complained about
harassment, unfair treatment, and an unnamed lieutenant getting
preferential treatment when she did not deserve it--plaintiff
claims that he was retaliated against by the taking away of his
vehicle, Lt. Morris not allowing him to attend the D.A.R.E.
picnic as a D.A.R.E. officer, Lt. Morris ordering him to see
Chief Melly when Chief Melly did not call for such a meeting, the
requirement that he leave his post at the end of his shift
instead of waiting for his relief to arrive, Lt. Morris marking
plaintiff as AWOL even though his request for time off had been
approved by another supervisor, and Lt. Morris asking plaintiff

17

for verification of his random drug test.  These claims are insufficient to establish his *prima facie* case.

First, these allegations, even if true, do not evidence adverse employment actions.  To prove an adverse employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotations omitted) (explaining that the "anti-retaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms . . . by prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers," and that "normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence").  Because plaintiff filed two EEOC complaints after this alleged retaliatory conduct, the claimed adverse employment actions did not deter him from availing himself of Title VII's remedial mechanisms.

Second, plaintiff has not demonstrated that his filing of the survey caused the alleged adverse employment actions. Plaintiff does not dispute that he filed the workplace survey anonymously, and even though he claims that his comment about an

18

undeserving lieutenant caused his supervisors to know that he submitted that survey, plaintiff provides no proof of that supposition other than his own belief.  Consequently, plaintiff has failed to establish this prong of his *prima facie* case as well.[8]

Next, plaintiff claims that the filing of his first EEOC complaint on September 3, 2003, his sending of the "Injustice at DOD Police" email on September 11, 2005[9], his filing of an

_____

[8]Even if plaintiff did establish a *prima facie* case with regard to his workplace survey, he has not provided any evidence to demonstrate that defendant's proffered reasons for the alleged adverse employment actions were a pretext.

[9]In his complaint, plaintiff alleges that his First Amendment rights were violated with regard to his sending of the email.  (Compl. ¶¶ 67.)  In his opposition brief, plaintiff appears to abandon his First Amendment claim, and instead contends that his sending of the email was a protected activity under Title VII.  Even if plaintiff did not abandon his First Amendment claim, it would fail because he has not proven the elements of such a claim.  See Curinga v. City of Clairton, 357 F.3d 305, 310 (3d Cir. 2004) (stating that in order for a public employee to maintain a First Amendment claim, he must demonstrate that (1) the speech involves a matter of public concern and the employee's interest in the speech outweighs the government employer's countervailing interest in providing efficient and effective services to the public; (2) the speech must have been a substantial or motivating factor in the alleged retaliatory action; and (3)  the employer would not have taken the adverse action but for the protected conduct); see also Engquist v. Oregon Dept. of Agr., 128 S.Ct. 2146, 2152 (2008) (discussing past Supreme Court precedent and explaining that the "First Amendment protects public-employee speech only when it falls within the core of First Amendment protection--[i.e.,] speech on matters of public concern--and when employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices; absent the most unusual circumstances, a federal court is not the appropriate

affidavit during the first EEOC investigation, and the filing of his second EEOC complaint on March 6, 2006 all constitute protected activity for which defendant retaliated.  It appears that plaintiff is arguing that his adverse employment action was his termination from employment.[10]

Accepting as true that these acts constituted protected activity,[11] recognizing that termination from employment is an adverse employment action, and recognizing that the email and affidavit were factors in his termination, the Court finds that plaintiff has established his *prima facie* case with regard to the email and filing of his affidavit.  Plaintiff, however, has failed to provide evidence to rebut defendant's overall reasons for his termination.  Furthermore, plaintiff has failed to establish his *prima facie* case with regard to the filing of his

---

forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior").

[10]By the time-line of events, it appears that plaintiff claims some of the same adverse actions that he allegedly suffered as a result of the workplace survey were caused by the filing his first EEOC complaint.  This claim fails for the same reason as his claim based on the workplace survey.

[11]In addition to instituting lawsuits, filing affirmative action complaints, and participating in litigation, other examples of protected activity are "making complaints to management," "writing critical letters," "protesting against discrimination," and "expressing support of co-workers." Montanye v. Wissahickon School Dist., 218 Fed. Appx. 126, 131 (3d Cir. 2007) (quoting Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)).

EEOC complaints because he cannot prove that those filings were the the proximate cause of his termination.

On January 25, 2006, plaintiff received from Director Melly a lengthy, eight-page "notice of proposed removal," which explained in detail the basis for his proposed termination. (Def. Ex. D.)  The first basis for termination was listed as "Making Inappropriate, Offensive, and Racially Derogatory Remarks in Written Format."  Lt. Sanders reported that on December 9, 2005 he found in his mailbox an envelope addressed to "Lt. Rick 'Sambo' Sanders" containing twenty-six pages of "printed material, unsigned, which contained language full of slanderous, hateful, racial and discriminatory remarks."[12]  An investigation ensued, and video of the mailbox area revealed that on December 8, 2005 at approximately 3:20am plaintiff placed something in the mailbox area where the supervisors' mailboxes were located.  The investigation also revealed that plaintiff reported for work at 3:00am that day, and that Lt. Sanders noted that his mailbox was empty when he last checked it in the evening of December 7, 2005.

On December 16, 2005, Director Melly spoke to plaintiff

---

[12]The first page of the materials states, "YOU ARE A REAL RAT AND A TRAITOR. YOU ARE MELLY'S SNATCH, A LACKY IF YOU WILL.  YOU CANNOT EVEN STAND UP FOR ONE OF YOUR OWN KIND.  I YOU AND MS. MORRIS ENJOY YOUR.  YOU KNOW DAMN WELL YOU HAVE HAD BOUTS WITH HER.  BUT I GUESS YOUR BOTTOM HALF TOOK OVER FOR THE TOP HALF. REMBER STUPID SHE IS MARRIED TO A 'WHITE MAN' . . . YOU ARE THE WRONG COLOR FOR NOW.  I HOPE YOUR RELATIONSHIP WITH HER WAS WORTH IT!!!!! YOU FINK UNCLE TOM.  DO READ THE ARTICLES YOU MIGHT LEARN SOMETHING."  (Def. Ex. V at 1.)

about the incident.  Melly reported that he asked plaintiff
whether he recalled going to the mailroom area or placing
anything in the mailbox of Lt. Sanders, and plaintiff did not
remember.  When offered to view the video, Melly reported that
plaintiff stated, "I don't need to see any video."  Melly also
reported that when he offered the materials for plaintiff to
review, he did not accept them and stated that he had never seen
them before.  Melly reported, "Despite having hardly looked at
the document, let alone having accepted it and read it, you
professed some familiarity with the substance of the document."
Based on the investigation and his meeting with plaintiff, Melly
concluded that he was "satisfied" that plaintiff placed the
materials in Lt. Sanders' mailbox, and that he had authored it or
read it prior to their meeting.  In the notice of termination
letter, Melly states, "This offensive, harassing and unacceptable
behavior toward any employee, especially a supervisor, will not
be tolerated."

     The next basis for plaintiff's termination was "Making a
False Sworn Statement."  Following plaintiff's meeting with Melly
with regard to the materials in Lt. Sanders' mailbox, plaintiff
prepared a sworn, notarized affidavit in support of a motion to
reopen the hearing of his pending EEOC complaint.  Melly states
in the notice of removal letter that plaintiff improperly
recounted the circumstances of their meeting.  In his affidavit,

plaintiff states that he accepted, and then immediately handed back, the packet of materials, and then requested to view the video.  Plaintiff also states that Melly asked plaintiff to "humor him," handed back the materials, and plaintiff then read them.  Plaintiff also states that he demanded three times to view the tape.  Melly states in his removal letter to plaintiff that none of this occurred and plaintiff's statements are "blatantly false."  Melly states that plaintiff's "willingness to lie in a sworn affidavit to be submitted in the course of a formal EEOC proceeding establishes that you do not have the requisite integrity required of a police officer serving the public interest."

The third basis for plaintiff's removal was "Misuse of Government Property."  As part of the investigation into the materials left in Lt. Sanders' mailbox, plaintiff's computer was searched.  The search revealed that plaintiff titled a bookmarked website as "UNCLE TOM."  Melly states in his letter that plaintiff violated Ft. Dix Policy #37 for the use of internet and email systems.

The final basis for plaintiff's removal was "Creating a Disturbance."  Melly reports that on September 13, 2005 he received an unsigned memorandum under his door.  The memorandum read, in part, "Sir, Has there become a racial issue within the Department?  Upon finding the attached document that was found in

our police department, and then reading the document, I find this VERY disturbing." The "attached document" was plaintiff's "Injustice at DOD Police" email he sent on September 11, 2005 to the government computers of supervisory and non-supervisory police officers within the DOD. Melly states in the removal letter, "It is evident to me that the intent behind your inappropriate e-mail was to solicit complaints against me from your fellow Police Officers because of my decision to temporarily promote Lieutenant Bonnie Graham-Morris to Major, while Major Jack Warlow was on extended leave due to major knee surgery. At the least, it was an attempt to create disharmony among the staff, and undermine my authority and position a your Police Chief, as well as the Director of Public Safety, to make decisions and manage the Directorate. Your actions were unprofessional, counterproductive, inappropriate, and misguided, and such conduct is unacceptable."

Also in the notice of removal letter, Melly expresses that the four bases for removal violated plaintiff's obligation as a police officer, as police officers are held to a higher standard of "sound judgment, trustworthiness, integrity, and propriety." Melly states that plaintiff has "shown serious disrespect" to two supervisors, breached "any trust or confidence" he had in plaintiff, failed to conduct himself in a professional manner, and that his "display of seriously poor judgment in this matter

raises significant doubt" in his mind whether plaintiff could
"conduct his police duties with the general public in a fair and
proper manner."

Plaintiff was advised that he could respond to the letter to
the Installation Manager, Robert Lichtneger, within fifteen days.
Plaintiff did so via letter from his attorney.  (Def. Ex. W.)

On April 13, 2006, Installation Manager Lichtneger filed his
"Notice of Decision."  (Def. Ex. X.)  Lichtneger reviewed all of
the evidence, and he sustained the charges in the notice of
removal.  Specifically with regard to plaintiff's defenses, he
found: (1) plaintiff's claim that he could not read the materials
without his glasses inconsistent with his other statement; (2)
plaintiff's claim that the bookmarks found on his computer were
for researching his EEOC charges was not credible because the
bookmarks were made "long after" he filed is October 2003 EEOC
complaint; and (3) plaintiff's claim that the "Injustice at DOD
Police" email did not suggest an insurrection or urge anyone to
create a disturbance was belied by the content of the email.
Lichtneger found that plaintiff's actions were "conclusively
disruptive, offensive, harassing and unequivocally unacceptable
given specifically that you directed this conduct towards a
supervisor."  As a result, Lichtneger made the decision to remove
plaintiff from federal service effective April 23, 2006, and
notified plaintiff that he could appeal to the MSPB within

fifteen days.

As stated above, plaintiff has failed to provide proof sufficient to go to a jury on his retaliation claims.  With regard to the filing of his affidavit and the sending of the "Injustice at DOD Police" email, plaintiff has failed to rebut defendant's proffered reasons for his termination.  Contrary to plaintiff's claim, plaintiff was not terminated simply because he filed an affidavit in his EEOC proceeding or sent an email to his colleagues.  Rather, plaintiff was terminated because the false statements contained in plaintiff's affidavit and the disturbance created by his email demonstrated plaintiff's unprofessional and dishonorable conduct, which evidenced plaintiff's inability to perform the essential functions of his assigned duties as a police officer.

In plaintiff's view, however, the act of filing of an affidavit in an EEOC proceeding or the sending of an email to co-workers should insulate him from any repercussions from the content of that affidavit or email.  If plaintiff's view were accepted, an employee would have *carte blanche* to make false statements, create a disturbance, or otherwise conduct himself inappropriately simply by performing those acts under the guise of protected activity.  That result is not contemplated by Title VII.

Here, the burden is on plaintiff to demonstrate by the

preponderance of the evidence that his incapability to act professionally and make sound judgments was not the motivating factor in his termination.  To meet the standard of proving that defendant's reasons for terminating him was a pretext, plaintiff must point "to some evidence, direct or circumstantial, from which a fact-finder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [the employer's] action." Foxworth v. Pennsylvania State Police, 228 Fed. Appx. 151, 158 (3d Cir. 2007) (citing Sheridan v. DuPont de Nemours & Co., 100 F.3d 1061, 1067 (3d Cir. 1996); Fuentes, 32 F.3d at 764)) Plaintiff has failed to do so.

Plaintiff's only evidence to support his claims is his own declaration.  With regard to the "Injustice at DOD Police" email, plaintiff states that it was directed "to minority members of the FOP and its purpose was to address what I felt were unfair and in fact unlawful working conditions, that being the preference of whites over officers of color." (Perry Dec. ¶ 12.)  He also states that the reference to Bloody Sunday was not a reference to an uprising or insurrection, but rather a reference to a civil rights event in 1965 where peaceful black protestors were physically attacked by the police while white onlookers cheered them.  (Id.)  With regard to the materials left in Lt. Sanders'

mailbox, plaintiff states in his affidavit that he was framed.
(Perry Dec. ¶ 32.)   Plaintiff's own interpretation of his email
and claim that he was framed with regard to the materials left in
Lt. Sanders' mailbox is not evidence, however, that defendant had
an "invidious discriminatory reason" for firing plaintiff other
than the articulated reasons.[13]

Similarly, plaintiff has failed to show that the filing of
his two EEOC complaints caused his termination.[14]   Plaintiff

---

[13]It is important to note that despite plaintiff's claim that
the purpose of the email was to expose "the preference of whites
over officers of color," plaintiff's email specifically
questioned the promotion of Lt. Morris, who is an Asian-American
female.
It is also worth noting that in plaintiff's complaint, he
claims that the statements contained in the "material left in the
mail box of Lieutenant Sanders were protected by the First
Amendment." (Compl. ¶ 67.)   Plaintiff made the same claim during
his MSPB appeal.   The Court questions why plaintiff would need to
avail himself of the protections of the First Amendment if he was
framed and did not make those statements.

[14]In his "Ex-Party Motion" to supplement his opposition to
summary judgment filed on June 19, 2008, plaintiff contends that
he has recently discovered that Lt. Sanders misrepresented his
previous employment during the fact finding hearing held on July
12, 2006 in regard to plaintiff's second EEOC complaint.
Plaintiff contends that "based upon information recently
provided" to him, he discovered that even though Lt. Sanders
stated that he had previously worked for the Philadelphia Police
Department, "it was confirmed by a representative who had access
to those records" that there was no record of Lt. Sanders ever
having been employed by the Department.   Plaintiff contends that
this is relevant to his opposition to defendant's summary
judgment motion because "it begs the question, why Sanders, who
falsely swore as to his past employment in a fact finding
hearing, was not subject to discipline," and, thus, "it could
permit a reasonable jury to find that plaintiff was not subject
to discipline due to false swearing but was subject to
disciplinary action as retaliation for having filed a complaint

filed his first EEOC complaint in October 2003, yet his removal was not effective until April 2006.  This lapse of time between the filing of his EEOC complaint and his termination is not unduly suggestive to satisfy his *prima facie* case.  Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003) (quoting Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003)("Even if timing alone could ever be sufficient to establish a causal link, . . . the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred.")); Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000) ("There is clearly a difference between two days and nineteen months."); Williams v. Philadelphia Housing Authority Police Dept., 380 F.3d 751, 760 (3d Cir. 2004) (holding that two months was not "unduly suggestive"); Thomas, 351 F.3d at 114 (holding that three weeks was not "unduly suggestive").

Plaintiff's second EEOC complaint was filed on March 3, 2006, which, although prior to the final decision of removal, was

---

of discrimination."  (Pl. Mot. at 4.)

Plaintiff's argument is without merit.  Not only are there significant evidentiary problems with his newly acquired "evidence" (plaintiff has failed to explain how and why he recently obtained this information), the issue of whether Lt. Sanders worked for the Philadelphia Police Department and whether he did not testify truthfully about his own employment history at plaintiff's EEOC hearing is immaterial to whether plaintiff was retaliated against for filing his EEOC claim.  Consequently, even if this "new information" were considered, it does not change the analysis of plaintiff's retaliation claim.

after Melly's notice of removal.  Thus, the four bases for removal which were upheld by Lichtneger had already been established prior to his filing of the second complaint. Additionally, plaintiff has not provided any evidence to refute Lichtneger's testimony at the MSPB hearing that he did not know that plaintiff had filed a second EEOC complaint when he issued his final decision.  Consequently, plaintiff has failed to establish his *prima facie* case that the filing of his two EEOC complaints caused his termination.[15]

Plaintiff may disagree with his supervisors' decisions, and dispute that his actions demonstrated an inability to perform the essential functions of his job as a police officer, but "Title VII does not prohibit unfairness or wrongheaded decisions in the workplace." Ramos v. EquiServe, 146 Fed. Appx. 565, 569 (3d Cir. 2005) (citing Fuentes, 32 F.3d at 765 and Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997) ("[W]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.")).  Plaintiff has not met his burden on his claims

---

[15]Even if plaintiff could establish his *prima facie* case, his claims based on his EEOC complaints would fail for the same reasons as his claims based on the affidavit and email, in that he has not demonstrated that the articulated reasons for his termination were a pretext.

of retaliation, and consequently, summary judgment must be entered in favor of defendant.

   **4.   Whether the MSPB improperly upheld plaintiff's removal**

   Plaintiff claims that the MSPB's decision to uphold his removal was in error because his removal was in retaliation for engaging in protected activity.  Because the Court has held that plaintiff has not met his burden of showing that the decision to fire him was retaliatory conduct in violation of Title VII, plaintiff's request to overturn the MSPB's decision based on the same claims is unavailing.

**CONCLUSION**

   Plaintiff has not provided sufficient evidence to defeat summary judgment on his hostile work environment and retaliation claims.  The evidence on the record demonstrates, at most, that plaintiff disagreed with certain decisions made by his supervisors with regard to the operation of the Ft. Dix Police Department, and that he disagreed with his superiors' view of how he voiced those concerns.  Plaintiff's disagreements, however, do not evidence discrimination and retaliation.  Consequently, summary judgment must be entered in favor of defendant on all of plaintiff's claims.  An appropriate Order will issue.


Dated: July 3, 2008              s/ Noel L. Hillman

At Camden, New Jersey            NOEL L. HILLMAN, U.S.D.J.